OPINION
Marsuan Conley appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which found that he was delinquent because he had committed an act of rape.
On June 25, 1998, Conley was found guilty of having committed an act of rape in violation of R.C. 2907.02. He was committed to the Department of Youth Services for institutionalization in a secure facility for a minimum of one year and a maximum period not to exceed his attainment of twenty-one years of age. He asserts one assignment of error on appeal.
 THE TRIAL COURT ERRED TO APPELLANT'S PREJUDICE WHEN IT ENTERED JUDGMENT OF GUILT WHERE SUCH JUDGMENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Conley claims that the trial court's conclusion that he had compelled Autaum Hill to engage in sexual conduct by force or threat of force was against the manifest weight of the evidence. Conley admits that he engaged in sexual conduct with Hill, but he claims that it was consensual.
In reviewing the weight of the evidence, an appellate court may reverse a judgment because it disagrees with the fact finder's resolution of facts only if it can conclude that the jury clearly lost its way and created a manifest miscarriage of justice requiring such reversal. State v. Stayton (1998), 126 Ohio App.3d 158,166, citing State v. Thompkins (1997), 78 Ohio St.3d 380,387. The power to reverse a conviction and grant a new trial is discretionary and "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."State v. Martin (1983), 20 Ohio App.3d 172, 175. We review the evidence presented at trial with this standard in mind.
The state's evidence was as follows.
Hill was sixteen at the time of the alleged offense, and Conley was seventeen. Hill testified that, on the evening of November 14, 1997, she had gone with several friends to a house on Lexington Avenue in Dayton where Conley and his friends were "hanging out" after Conley had paged her and asked her to come. Hill and Conley were acquaintances, but they did not have a sexual relationship. Shortly after Hill and her friends arrived, Hill, Conley, and a few others went to a nearby store to purchase alcohol. On the trip to the store, Conley and his friends flashed handguns, and Hill's friends quickly became uncomfortable about staying at the party. Hill admitted that she had been drinking and had a slight buzz. As Hill's friends were getting ready to leave the house, Conley snatched a diamond ring off of Hill's finger. Conley pretended to throw the ring into the yard, and Hill became very upset trying to retrieve the ring because it had belonged to her grandmother. One of Conley's friends told Hill that she would have to "suck all of our dicks" to get the ring back, a proposition that Hill and her friends did not take seriously at the time. Increasingly frantic to get her ring back, Hill cut her wrist with a broken bottle to get attention. As Hill's friends grew increasingly uncomfortable, they urged Hill to leave without the ring, and they got into the car. Hill initially got into the car with them, then jumped back out after the car was moving, saying that she would do what she had to do to get her ring back. Hill testified that, in saying this, she had meant that she would trade her other jewelry for the ring if she had to, and her friend Terika Hunt interpreted the comment this way. When Hill jumped out of the car, she saw Conley walking down the street to a friend's house and, believing that one of his friends had her ring, she followed him. She entered the side of a duplex where one of Conley's friends, Reno Thomas, lived.
Shortly after she entered the duplex, Conley and his three friends ordered Hill to take her clothes off. At first, Hill did not take them seriously, but three of the men brandished guns, and Hill quickly became fearful that they would harm her if she did not comply. The lights were turned off, and Hill was repeatedly and simultaneously raped orally, vaginally, and anally by the four men while her hands were tied to the leg of a coffee table with a lamp cord. Conley and another man waved their guns around Hill's face during the rapes and penetrated her with their guns. Thomas raped Hill again upstairs after the other assaults had ended. Hill's clothes and ring were then returned to her. Hill estimated that the rapes had lasted one and one-half to two hours.
After the rapes, Hill and Thomas went to the other side of the duplex where some women, including Thomas's mother, were gathered. Based on Hill's appearance and behavior, the women asked Hill what had happened to her and, specifically, whether she had been raped. Hill briefly told them what had happened, but Conley came in and told her to be quiet or he would kill her. Hill then left the duplex and was walking down the street with Conley when her friend Hunt returned and picked her up. Hill, who was disheveled and upset, told Hunt that she had been raped. Hunt took Hill home and then to the hospital. The hospital examination revealed the presence of semen in Hill's vagina and in her hair, but there were no other indications of trauma.
When interviewed by the police, Conley indicated that he had engaged in consensual sex with Hill and that others had joined in. He denied having had a gun. Thomas's mother, Dianne Woullard, testified for the defense. She stated that she had been in the other side of the duplex when the rapes were alleged to have occurred and that she had heard nothing out of the ordinary. She claimed that when Hill had come into the other side of the duplex and was questioned about what had happened, Hill had denied being raped. According to Woullard, Hill had stated that she had wanted to "suck their things," that she had really wanted to have sex with Thomas to get even with Conley for cheating on her, and that she had lied to Thomas about her age. Woullard testified that she had offered to call the police on her son if his conduct had warranted it, but that Hill had not wanted her to call the police. She also testified that Hill had called Thomas to apologize sometime after accusing him of rape, stating that she had made up her story because she had been picked up for a curfew violation.
The trial court found that Conley had engaged in sexual conduct with Hill by force or threat of force and found him guilty of rape beyond a reasonable doubt. From its journal entry, it is apparent that the trial court found the state's evidence to be credible and found the discrepancies in the evidence to be insignificant. In our view, these conclusions were not unreasonable. The trial court could have reasonably concluded that Hill's version of events was more credible than the version presented by the defense, which came primarily from the mother of one of the alleged offenders. Moreover, the lack of significant medical indicators of trauma, a factor upon which Conley heavily relies, did not require the trial court to conclude that the sexual activity was consensual, especially when the nurse who testified at trial was unable to testify in any detail to the results of the physical examination conducted by the doctor. Because we cannot conclude that the trial court's judgment created a manifest miscarriage of justice, we will not reverse that judgment as being against the weight of the evidence.
The assignment of error is overruled.
The judgment of the trial court will be affirmed.
GRADY, P.J. and YOUNG, J., concur.
Copies mailed to:
Johnna M. Shia
James C. Staton
Hon. Michael B. Murphy